UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


THERESA HAYES,

       Plaintiff,                                    Hon. Ellen S. Carmody

v.

                                              Case No. 1:13-cv-484

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.
_____/

## **OPINION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. On July 24, 2013, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment. (Dkt. #13).

        Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

1

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 43 years of age on her alleged disability onset date. (Tr. 183). She successfully completed high school and previously worked as a retail salesperson, stock clerk, and retail store manager. (Tr. 34, 66-67). Plaintiff applied for benefits on August 11, 2010, alleging that she had been disabled since April 3, 2009, due to spinal arthritis, hypertension, lupus, high blood pressure, and a growth on her left foot. (Tr. 183-95, 207). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 75-182). On January 20, 2012, Plaintiff appeared before ALJ Jonathan Stanley with testimony being presented by Plaintiff and a vocational expert. (Tr. 42-74). In a written decision dated February 6, 2012, the ALJ determined that Plaintiff was not disabled. (Tr. 21-36). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-5). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## **RELEVANT MEDICAL HISTORY**

On April 23, 2009 Plaintiff was examined by social worker Silvia Orian. (Tr. 383-85). Plaintiff reported that she was experiencing depression, tearfulness, anger, and "constant

sadness." (Tr. 383). Plaintiff reported that she was "filled w[ith] hate" and feared leaving her house "due to angry feelings." (Tr. 383). Plaintiff also reported experiencing hallucinations. (Tr. 383). Orian concluded that Plaintiff was experiencing paranoia, auditory and visual hallucinations, insomnia, lack of appetite, lupus, and substance abuse. (Tr. 385). Plaintiff's GAF score was rated as 30[1] and Orian recommended that Plaintiff be referred to a psychiatrist for medication and counseling. (Tr. 385). Treatment notes indicate that Plaintiff continued to regularly treat with Orian through November 2010. (Tr. 340-82).

On August 5, 2009,[2] Rebecca Katovisich, Ph.D., completed a questionnaire regarding Plaintiff's mental residual functional capacity. (Tr. 596-600). Dr. Katovisich reported that Plaintiff suffered from: (1) mood disorder, not otherwise specified, severe with psychotic features; and (2) panic disorder without agoraphobia. (Tr. 596). Plaintiff's current GAF score was rated as 38[3] and her highest GAF score in the past year was rated as 35. (Tr. 596). The doctor reported that Plaintiff experienced the following "signs and symptoms":

1. Anhedonia or pervasive loss of interest in almost all activities.
2. Appetite disturbance with weight change
3. Decreased energy
4. Thoughts of suicide
5. Blunt, flat or inappropriate affect

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereinafter DSM-IV). A GAF score of 30 indicates that the individual's "behavior is considerably influenced by delusions or hallucinations" or that the individual is experiencing "serious impairment in communication or judgment" or "inability to function in almost all areas." DSM-IV at 34.

[2] The date that is handwritten on the last page of this report suggests that the report was signed on August 5, 2008. However, a review of the report itself reveals that the report was almost certainly signed on August 5, 2009. First, that is the date that is time stamped on the report indicating that it was faxed following completion. Furthermore, the report indicates that the doctor first examined Plaintiff on April 23, 2009, and continued to see her through July 30, 2009.

[3] A GAF score of 38 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 34.

4

   6. Feelings of guilt or worthlessness
   7. Impairment in impulse control
   8. Generalized persistent anxiety
   9. Mood disturbance
   10. Difficulty thinking or concentrating
   11. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress
   12. Psychomotor agitation or retardation
   13. Persistent disturbances of mood or affect
   14. Paranoid thinking or inappropriate suspiciousness
   15. Seclusiveness
   16. Emotional withdrawal or isolation
   17. Intense and unstable interpersonal relationships and impulsive and damaging behavior
   18. Perceptual or thinking disturbances
   19. Hallucinations or delusions
   20. Emotional lability
   21. Deeply ingrained, maladaptive patterns of behavior
   22. Illogical thinking
   23. Pathologically inappropriate suspiciousness or hostility
   24. Memory impairment - short, intermediate or long term
   25. Sleep disturbance
   26. Oddities of thought, perception, speech or behavior
   27. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week

(Tr. 597).

With respect to the nature of her treatment for Plaintiff, the doctor reported that she was pursuing "[c]ognitive behavioral and solution focused therapies," but was experiencing "limited progress due to chronic nature of disorder and limited/lacking treatment prior." (Tr. 596). The doctor described "the clinical findings including results of mental status examination that demonstrate the severity of [Plaintiff's] mental impairment and symptoms," as follows:

> Severe social and occupational impairment: isolation, diminished problem-solving and decision-making capacity, anger/rage outbursts, h[istory] of physical assault and property damage. Confusion and

5

>   lack of emotional resilience due to ineffective/maladaptive coping
>   mechanisms creates increased potential for crisis periods.

(Tr. 596). The doctor characterized Plaintiff's prognosis as "poor" because her "symptoms are likely to remain chronic and pervasive." (Tr. 596).

With respect to Plaintiff's "mental abilities and aptitudes needed to do unskilled work," the doctor described as "unable to meet competitive standards" Plaintiff's abilities in the following areas: (1) remember work-like procedures; (2) maintain attention for two hour segment; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or proximity to others without being unduly distracted; and (5) deal with normal work stress. (Tr. 598).

The doctor characterized as "no useful ability to function" Plaintiff's abilities in the following areas: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms; (2) perform at a consistent pace without an unreasonable number and length of rest periods; (3) accept instructions and respond appropriately to criticism from supervisors; (4) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (5) respond appropriately to changes in a routine work setting; and (6) be aware of normal hazards and take appropriate precautions. (Tr. 598).

With respect to Plaintiff's "mental abilities and aptitude needed to do particular types of jobs," the doctor characterized as "seriously limited, but not precluded" Plaintiff's abilities in the following areas: (1) interact appropriately with the general public; and (2) travel in unfamiliar place. (Tr. 599). The doctor characterized as "unable to meet competitive standards" Plaintiff's abilities in the following areas: (1) maintain socially appropriate behavior; and (2) use public transportation. (Tr. 599). The doctor further explained her opinions by noting the following:

> Theresa's paranoia, memory impairment and lack of healthy coping mechanisms seriously limits her ability to interact appropriately with other[s] as evident by two crisis calls during the course of t[reatment] where she threatened her pcp's life and was unable to resolve a family conflict...serious impairment in decision-making, problem solving. Theresa has a significant h[istory] of physical assault when feeling/perceiving a threat. These rage-type episodes occurred in various settings and caused legal ramifications including incarceration; most recently Theresa states she copes with these feelings/thoughts through self-imposed isolation causing marked social functional impairment.

(Tr. 599). The doctor also noted that Plaintiff's "impairments or treatment" would cause her "to be absent from work...more than four days per month." (Tr. 600).

On November 9, 2010, Silvia Orian authored a letter concerning Plaintiff's condition. (Tr. 337-39). With respect to the background concerning Plaintiff's emotional impairments, Orian reported the following:

> Theresa began experiencing severe depression and anxiety symptoms more than eight years ago when she was so grieved over her mother's death that she was told to leave work. Afterwards, Theresa began to decline physically and mentally/emotionally until she rarely left her home; she anticipated the worst happening and she could not go out in public without feeling so much intensity and anger that she felt unable to control herself. Rather than continue to injure others, she decided to isolate herself. Many years passed before she felt able to trust someone with her feelings and decided she wanted to be able to attend parent/teacher conferences, her daughter's graduation, and go to the store during regular business hours.
>
> Theresa reported she was diagnosed in 2007 with Lupus and since then has experienced difficulty acquiring adequate medical care due to fragmented care and a lack of overall medical case management. This has been a focus of treatment throughout her care. Furthermore, she reports she has been diagnosed with high blood pressure, osteoarthritis/osteoporosis, paralysis/loss of limb control, and bald spots.

(Tr. 338). Orian reported that Plaintiff was presently suffering: (1) mood disorder NOS with

psychotic features; (2) panic disorder with agoraphobia; (3) posttraumatic stress disorder, chronic; (4) relational problem with partner; and (5) relational problem with children.  (Tr. 338).  Orian reported that Plaintiff's current GAF score was 57.[4]  (Tr. 338).  Orian concluded as follows:

> Theresa was initially treated with Cognitive-Behavior Therapy for anxiety and depression to support her ability to tolerate her symptoms, increase self-acceptance of grief/guilt and improve her ability to create new schemas and core beliefs.  To date, Trauma-Focused Cognitive-Behavioral Treatment has improved Theresa's coping skills, her judgment and her expectations as well as her ability to begin the process of forgiveness.  Further progress toward treatment goals include self-advocacy, reduction of emotional reactivity and increased social functioning.  While her progress has been significant, her prognosis is still very limited.  Due to the pervasive nature and longevity of her disorders (physical and mental), Theresa clearly displays a diminished ability to regulate herself socially and to attain and maintain employment.  This clinician anticipates Theresa will require ongoing interventions to increase her functioning and support her development of healthier life engagement.

(Tr. 338-39).

On November 9, 2010, Plaintiff participated in a consultive examination conducted by Anne Kantor, Limited License Psychologist.  (Tr. 386-92).  Plaintiff reported that she was experiencing back pain, lupus, carpal tunnel, migraines, vision problems, and high blood pressure.  (Tr. 386-87).  With respect to her social functioning, Plaintiff responded as follows:

> Family: "I stay away from all of 'em because they judge you.  I don't go to any cookouts or events or anything."
>
> Neighbors: "I'm close to goin' to jail now because of my neighbors. They call the police on me all the time, but they do horrible things. They pick and do little things, and then when you defend yourself and they think you doin' it a little too strongly they call the police.  When

---

[4]  A GAF score of 57 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning."  DSM-IV at 34.

> I get angry I don't know how to turn it off. The police just talk to me, and they tell them to leave me alone. They tell them to keep their children out of my yard. If I wanted kids in my yard ruinin' all my beautiful flowers I woulda kept havin' kids myself. Don't that make since? (sic) I complain a lot because I don't want it."
>
> Friends: "None. I've had friends in the past, but I don't have any now. I did a lotta things for people, and they still owe me, so I wouldn't say that's a friend. When I worked I worked hard so that I could afford to do a lotta favors."
>
> Employers and coworkers: "I had trouble only when they were bein' unfair, but that happened a lot. Then I would get mad and get physically violent."

(Tr. 388).

With respect to her interests, Plaintiff responded as follows:

> "I like to read about Yahweh. I'm waitin' on him to save me. I spend most of my time reading. I don't really like radio or television. I like silence. I'm searching for peace. It's not in America, but there is peace. It's in heaven. I don't celebrate holidays for religious reasons. I don't believe in any pagan festivals."

(Tr. 388).

With respect to Plaintiff's mental status, Kantor observed that Plaintiff was "dependent" and "extremely focused on herself and her symptoms." (Tr. 389). Kantor described Plaintiff's thought content as follows:

> Hallucinations: denies.
>
> Persecutions: "It always have been people against me, the same people that hated my mother and made her a slave and make her pick cotton because they were too lazy to do it. I constantly get my ass kicked every day, and I get jobs taken away from me every day because they're havin' a bad day or they're tired of lookin' at my brown face."

9

> Obsessions: "I've thought about takin' my life, but that was in the past, not now. Then I've wanted to kill other people, everyone that had mistreated me or took somethin' from me just because they had the power to."
>
> Thought control by others: "I live with someone that...uh...yes, to an extent the gentlem[a]n that I stay with does that."
>
> Unusual powers: "Yeah, I feel things that my sisters go through. There have been a couple times that I thought somethin' was goin' on with them, and then something would happen. There would be some jealous scorn women that wanted to do somethin' to them. We had that problem a lot when we first moved to Benton Harbor."
>
> Suicide: "Yes, twice. The first time someone came to the house and beat on the door and kind of interrupted me so I didn't do it. The second time my youngest daughter work up screamin' like she was havin' a nightmare, and that stopped me. I never actually made an attempt, no."
>
> Sleep disturbance: "I always dream about bein' in the dark. Everything is black, but I can see shadows movin'."
>
> Weight loss/gain: "It goes up and down some, but it always has."

(Tr. 389-90).

With respect to Plaintiff's "emotional reaction," Kantor reported Plaintiff's comments as follows:

> "I'm in a mean mood most of the time. I'm mean (laughed). People really try to not say much to me at all. I scare myself. My family is ashamed of me. I've been like this for a long time, and I'm havin' to depend on someone I don't even wanna be with. I don't even know if he will let me walk away. I've kicked holes in doors. My whole foot went through a door. I break dishes. I do a lot of breaking and throwing stuff. I think I've always had a temper problem. I don't know how to explain it."

(Tr. 390).

Plaintiff was diagnosed with cannabis abuse, mood disorder (not otherwise specified),

and personality disorder (not otherwise specified). (Tr. 391). Plaintiff's GAF score was rated as 48.[5] (Tr. 391). Kantor concluded:

> The patient is capable of understanding, remembering and carrying out instructions and making decisions regarding work-related matters. However, she is likely to continue to have marked to extreme difficulty interacting appropriately with others and succeeding in the workplace due to factors associated with her mood disorder and personality disorder.

(Tr. 391).

Treatment notes indicate that Plaintiff participated in counseling with Silvia Orian from October 2010 through November 2011. (Tr. 778-98).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[6] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§

---

[5] A GAF score of 48 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 34.

[6]
1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

11

404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) cervical degenerative disc disease; (2) plantar warts; (3) mood disorder; (4) personality disorder; and (5) cannabis abuse, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 24-27).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work subject to the following limitations: (1) she can lift/carry 20 pounds occasionally and 10 pounds frequently; (2) in an 8-hour workday with normal breaks, she can sit and stand/walk for 6 hours each; (3) she can frequently climb ramps and stairs and occasionally climb ladders and scaffolds; (4) she can occasionally kneel and can frequently balance,

stoop, crouch, and crawl; (5) she can understand, remember, and carry out short, simple instructions and make simple work-related judgments; (6) she can maintain adequate attention and concentration to perform simple tasks consisting of 1-2 steps; (7) she has the ability to manage and tolerate occasional changes in the work setting; (8) she can interact occasionally with supervisors; and (9) she can have only superficial contact with co-workers and the general public. (Tr. 27).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding.

The vocational expert testified that there existed in southwest Michigan approximately 13,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 66-71). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

I.        **The ALJ Failed to Properly Evaluate the Opinion Evidence**

As noted above, Dr. Katovisich completed a questionnaire concerning Plaintiff's emotional impairments and the extent to which such limit Plaintiff's ability to perform work activities. As detailed above, the doctor concluded that Plaintiff was limited to an extent far beyond that recognized by the ALJ. Despite stating that he accorded "significant weight" to Dr. Katovisich's opinion, the ALJ's RFC determination is significantly inconsistent with the doctor's opinion. Plaintiff asserts that she is entitled to relief because the ALJ failed to either afford controlling weight to her treating physician's opinion or articulate good reasons for declining to do so.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*,

14

839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

While the ALJ stated that he accorded "significant weight" to Dr. Katovisich's

opinion, his RFC determination is quite inconsistent with the doctor's opinions and conclusions. Dr. Katovisich found Plaintiff significantly more limited than the ALJ determined. However, despite Dr. Katovisich's status as a treating physician, the ALJ offered absolutely no reasons or rationale for why he was according less than controlling weight to the doctor's opinion. In sum, the ALJ failed to articulate sufficient reasons for discounting Dr. Dr. Katovisich's opinions. In light of the fact that the doctor's opinions are inconsistent with the ALJ's RFC determination, the ALJ's failure is not harmless. The ALJ's failure clearly violates the principle articulated in *Wilson* and renders his decision legally deficient.

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision must be reversed, there does not exist *compelling* evidence that Plaintiff is disabled. In sum, evaluation of Plaintiff's claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance. The Court concludes, therefore, that the Commissioner's decision must be reversed and this matter remanded for further factual findings.

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and the matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**. A judgment consistent with this opinion will enter.


Date:  September 23, 2014                              /s/ Ellen S. Carmody
                                                                        ELLEN S. CARMODY
                                                                        United States Magistrate Judge